1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

10

11
12
13
14
15
16
17

GUY RASMUSSEN,

              Petitioner,

     v.

RICHARD MORGAN,

              Respondent.

Case No.  C04-5448RJB

REPORT AND
RECOMMENDATION

Noted for **November 10, 2006**

18
19
20
21
22
23
24
25

     This matter has been referred to United States Magistrate Judge J. Kelley Arnold pursuant to 28 U.S.C. § 636(b)(1)(A) and 636 (b)(1)(B), and Local Magistrates Rule MJR3 and MJR4.   Petitioner is seeking federal habeas relief, pursuant to 28 U.S.C. § 2254, from state jury convictions for aggravated murder in the first degree, kidnapping in the first degree, and rape of a child in the first degree, arising out of the Superior Court for Pierce County, Washington.  Petitioner was sentenced to life in prison without the possibility of parole.  He is currently detained at the Washington State Reformatory in Monroe, Washington.

26

## PROCEDURAL AND FACTUAL BACKGROUND

27
28

     The Petition, which raises nineteen grounds for habeas corpus relief, was filed with the court on July 29, 2004, along with a motion to stay the matter pending the outcome of state court proceedings

1  (Docs. 1 & 2).  Following a request for an extension of time to Answer to the petition and the filing of the

2  Answer, on March 28, 2005, the court granted Petitioner's request to stay the matter to afford Petitioner a

3  full and fair opportunity to present all of his claims to the state court.  The matter was stayed until May 26,

4  2006, when the court reviewed Petitioner's "Final Status Report" in which Petitioner informed the court

5  that he received the Washington State Supreme Court's order Denying his motion for Discretionary

6  Review on January 31, 2006, and Petitioner previously informed the court that he requested that claims  4,

7  14, and 17 be stricken from his petition.  The court directed Respondent to file an Amended Answer to

8  address the claims in light of the state court proceedings that had been completed since filing of the original

9  Answer.  The Amended Answer (Doc. 35) was filed on August 24, 2006, and Petitioner's response (or

10  traverse) was submitted on September 8, 2006.  Accordingly, the matter is ripe for decision.

11      The factual basis for Mr. Rasmussen's convictions is extensive.  The crimes involved the

12  disappearance, rape, and murder of a nine year old girl.  A period of 32 months spanned  the child's

13  disappearance, on July 4, 1996, to the conclusion of the state court trial and judgment and sentence, on

14  March 9, 1999.  The trial lasted  approximately three months (October 21, 1998 through January 28,

15  1999.)   The following factual summary, with footnote citations to the underlying record omitted, is taken

16  from the State Court of Appeals:

17
18      On July 4, 1996, Rhonda Plank lived in Lakewood with her daughters, Cynthia
       Allinger, age 9, and Ashley Allinger, age 7 [footnote omitted].  Rasmussen had previously
19     lived in the same neighborhood, and Cynthia had occasionally visited him.

20      On July 4, 1996, Rasmussen was living in a trailer park about two miles from the
       neighborhood in which Plank and her daughters lived, and in which he had formerly lived.
21     He was sharing a trailer with a roommate, James Haggard. He had been introduced to
       Haggard by Jay Kuerst, who lived in the trailer next door. Haggard and Rasmussen did not
22     have a phone, so Rasmussen made and received calls from Kuerst's phone. Rasmussen's
       nickname was "Razz."

23      During the day or evening of July 4, Cynthia disappeared.  At 11:00 p.m., Plank
       called 911 to report her missing. Plank told the dispatcher that a neighbor, a sex offender
24     called "Razz," might be "involved."

25      That same night, Deputy Alwine went to Plank's home. He spoke with both Plank
       and Ashley. Plank said she had last seen Cynthia at 3 p.m., when Cynthia had left to go a
26     friend's house. Plank also said that she had been told by Ashley that Cynthia had gone to
       see "Razz." Ashley said that she knew who "Razz" was, but that she had not seen him that
27     day.

28      Between July 5 and July 17, when Cynthia's body was found, many police and
       citizens were involved. The police received "enormous volumes of tips and folks calling in

and people attempting to contact us and give us information."3 It was a "mammoth investigation," and there were "up to a dozen agents doing nothing but tip control[.]"

Early on July 5, Detective Teresa Berg was assigned as lead investigator. From other deputies and Alwine's report, she learned that Cynthia "might have been with a fellow named Razz, who was later identified as Guy Rasmussen."

Around 9:00 a.m. on July 5, Berg contacted Plank at her residence. Plank said Cynthia had left at about 3 p.m. on July 4, while Plank was washing her car. Plank thought Cynthia was going to play with her friend Shannon, but Ashley later told Plank "Cynthia was going to go see Razz[.]" Plank thought Ashley 'knew of' Razz "from Cynthia."

Later on July 5, Berg interviewed Plank again. Plank said that she had made lunch for her daughters at about 1 p.m. on July 4. Cynthia then left to play with Shannon, and Plank went outside to wash her car. When Berg pressed Plank for a time when Plank last saw Cynthia, Plank said "approximately 1630 hours {4:30 p.m.}." Given that July 4 was a holiday, Berg thought that Plank just "hadn't kept track of the time {.}"

Berg then spoke with Ashley, age 7, who said she had seen Rasmussen the previous day. When Berg asked whether that was before or after lunch, Ashley said "before lunch." Cynthia had told Ashley that Cynthia "was going to go see Razz{,}" and that "Razz was going to show her his new house." Ashley had seen Cynthia and Rasmussen about "halfway about between her house and Razz's old house." When asked again to estimate the time, Ashley at first said "before lunch"; then, however, she said "that Cynthia had saw (sic) Razz after lunch but then before dinner." Sometime after July 7, Berg learned that Ashley told Alwine on July 4 that Ashley had not seen Rasmussen "that day."

When Berg left Plank's, she returned to the station to "keep up with the search and the tips and information coming in[.]" Later that day, she learned that Rasmussen was currently at the Rainbow Valley Music Festival in Lewis County.

On July 6, Berg again interviewed Plank. Plank said that "Cynthia and Ashley were at Shannon's house by ... 1 o'clock, but they weren't there very long ... {and} came back together at approximately ... 4:30." As Berg and Plank were discussing Rasmussen, Plank said that "Ashley knew not to go there and that she had never seen Razz before."

Berg then contacted a neighbor named Chong Huff. Huff said that between 3:00 p.m. and 4:00 p.m. on July 4, while outside washing her car, she had seen "a white male, tall, thin and with long curly hair and he was walking with what she thought to be about a seven to eight-year-old girl and he was holding her by the hand and they were coming through an opening in her fence[.]"

Later on July 6, Detective Floberg told Berg that Cierra Hull, a nine-year-old playmate of Cynthia's, had told him that "during the afternoon or the early evening of July 4th, she saw a white male holding Cindy's hand and they were walking in front of her apartment complex." When Hull said "hello" to Cynthia, Cynthia "tried to say hello back{,}" but "the male had tugged Cindy's hand[.] After looking at a photo montage, Hull identified Rasmussen as the man with Cynthia. Floberg did not then relate the time at which Hull thought she had seen Cynthia with the defendant, but he told Berg, sometime after July 7, that Hull thought it was about 7:30 p.m.

Also on July 6, Floberg told Berg that on July 4 at about 5:30 p.m., Gary Cormier, a friend of Kuerst's, had given Rasmussen a ride from a convenience store to Rasmussen's trailer. Rasmussen was "wearing a tie-dyed type shirt, some cut off denim shorts, a black fanny pack[.]" At the trailer, Rasmussen showered, and he "may have changed his clothing." Later that evening, he went to the Rainbow Valley Music Festival. Sometime

after July 7, Berg learned that Rasmussen had called Kuerst's phone at 4:15 p.m. on July 4 to arrange the ride from the convenience store.

By the early morning hours on July 7, Berg wanted to search Rasmussen's trailer for the clothes he had been wearing and any trace evidence that might be on them. Working under time pressure other officers had secured the trailer that Rasmussen and Haggard shared, and Haggard was waiting to re-enter it Berg prepared notes of what she would say to the judge. She did not include, because she did not then know, that Rasmussen had called Kuerst's for a ride at 4:15 p.m., or that other tipsters had claimed to see a girl loosely matching Cynthia's description playing in the neighborhood between 5 and 9 p.m. She did not include, because she did not deem significant, Plank's statement that Plank had last seen Cynthia at 4:30 p.m.; Ashley's statement that she did not know Rasmussen; or Ashley's statement that she had seen Rasmussen "before lunch." She did not say that Hull had claimed to have seen Rasmussen with Cynthia at about 7:30 p.m., but she did say that Hull claimed to have last seen Cynthia "in the late afternoon or early evening."

At 1:30 a.m. on July 7, Berg paged the on-call judge. She checked her recording equipment before she did that, and it seemed to be working. When the judge called her back, she read to him from the notes she had prepared, as well as from "a standard warrant form." He issued the search warrant, and she "headed out the door" to serve it. Being "in a hurry[,]" she did not check the recorder at that time.

When the officers searched Rasmussen's trailer, they found various items of clothing that were later admitted at trial. Tests on some of those items revealed Cynthia's DNA.

On July 9, Berg "was going to have the tape transcribed." She found, however, that the recorder had failed. The type of phone she was using may not have been compatible with the recorder, or "the wiring on the transmitter device"' may have been "loose[.]"

On July 10, 1996, Berg informed the on-call judge that the recording had failed. He told her to type up a statement showing what had occurred. Using the handwritten notes she had read from while on the phone with the judge, she typed a statement and took it to the judge. He thought that it fairly reflected the contents of their discussion in the early morning hours of July 7, so he signed it "nunc pro tunc July 7, 1996." The statement now appears in the record as a "Complaint for Search Warrant."

On November 18, 1996, the State charged Rasmussen with aggravated murder in the first degree, kidnapping in the first degree, and rape of a child in the first degree. It also charged the death penalty.

Before trial, Rasmussen moved to suppress the items taken from his trailer because (a) the tape recorder had failed and (b) Berg had recklessly or intentionally failed to inform the on-call judge of all facts material to probable cause. In March 1998, after extensive hearings, the trial court entered findings of fact that parallel the facts recited above. Based on those findings, the trial court concluded that the failed recording had properly been reconstructed, that Berg's omissions were not reckless or intentional, and that the motion to suppress should be denied.

In January 1999, after a long trial, the jury found Rasmussen guilty. It could not agree on the death penalty, so he was sentenced to life without parole.

Exhibit 6 at 1-7, attached to Respondent' Submission of State Court Record, filed on November 15, 2004.

As noted above, the Petition for writ of habeas corpus filed with this court raises nineteen grounds for relief, challenging his conviction and sentence.  They are stated as follows:

1. The lead detective omitted exculpatory facts from the affidavit for probable cause when she obtained a warrant to search his residence and the trial court erred in denying the motion to suppress evidence.

2. The trial court erred in denying Petitioner's motion to suppress evidence because the material exculpatory facts omitted from the affidavit for probable cause were available to the officer who submitted the affidavit to get a search warrant.

3. The trial court erred in denying Petitioner's motion to suppress evidence because the officer who obtained the search warrant did not record the telephonic application for the search warrant.

4. Petitioner received ineffective assistance of trial counsel because his defense counsel failed to move to suppress evidence where the chain of custody had been broken.

5. The trial court erred in denying discovery of a DNA database.

6. The trial court erred when it excluded testimony of several witnesses.

7. The trial court erred when it precluded Petitioner from introducing "other suspect" evidence.

8. The trial court erred when it denied a three-week stay for defense counsel to investigate exculpatory evidence.

9. The trial court improperly admitted testimony that suggested Petitioner had committed prior criminal acts.

10. The trial court improperly admitted testimony about Petitioner not wanting to talk to police and the state prosecutor described this to the jury during closing argument as an indication of guilt.

11. The trial court improperly admitted evidence of photos of the victim's decomposed body.

12. Trial counsel rendered ineffective assistance by failing to move to suppress crime scene evidence where the detective had moved the victim's body, compromising the crime scene.

13. The trial court improperly ordered Mr. Rasmussen to be in shackles in front of the jury.

14. Trial counsel rendered ineffective assistance by failing to challenge comments in the prosecutor's opening argument which referred to upcoming testimony of witnesses who allegedly saw the victim with Petitioner and the state ultimately never called the witnesses.

15. The prosecutor's closing argument contained multiple instances of misconduct and improper statements.

16. Trial counsel rendered ineffective assistance by failing to object to any of the prosecutorial misconduct in the closing argument.

17. There was insufficient evidence to support a rape conviction.

18. There was insufficient evidence of pre-meditation to support an aggravated murder conviction.

19. Cumulative error deprived Mr. Rasmussen of a fair trial.

As noted earlier, Petitioner voluntarily dismissed grounds # 4, 14, and 17, and thus, these claims will not be discussed or addressed by the court.  After carefully reviewing the petition for writ of habeas corpus, the answer to the petition, and the relevant state court record filed by respondent, the undersigned recommends denial of the writ.

## EVIDENTIARY HEARING NOT REQUIRED

In its Order Directing Service and Response, the court directed respondent to state whether or not an evidentiary hearing was necessary.  The function of an evidentiary hearing is to try issues of fact; such a hearing is unnecessary when only issues of law are raised.  See, e.g., Yeaman v. United States, 326 F.2d 293 (9th Cir. 1963). The undersigned judge concludes that there are no relevant factual disputes to resolve in order for the Court to render its decision in this case.  Accordingly, an evidentiary hearing was not conducted.

## DISCUSSION

On April 24, 1996, the Antiterrorism and Effective Death Penalty Act of 1996 which significantly affected 28 U.S.C. §§ 2244, 2253, 2254 and 2255, was enacted.  Revised Section 2254(d) reads:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented in the State court proceeding."

28 U.S.C. § 2254(d); Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996).  Section 2254(e) states:

> In a proceeding instituted by an application for a writ of habeas corpus by person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

Relatively recently, the Ninth Circuit, sitting en banc, commented on the effect of the revisions:

> The [Antiterrorism] Act limits the ability of federal courts to reexamine questions of law and mixed questions of law and fact.  Historically, federal habeas courts have reviewed all questions of law and mixed questions of law and fact de novo. Wright v. West, 505 U.S. 277, 299-304, 112 S.Ct. 2482, 2494-97, 120 L.Ed.2d 225 (1992) (O'Connor, J.,

concurring).  Under the amendments to Chapter 153, federal courts must restrict their legal analysis to whether the state decision was contrary to or an unreasonable application of "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. S 2254(d)(1).  The Act further restricts the scope of federal review of mixed questions of fact and law.  28 U.S.C. S 2254(e).  De novo review is no longer appropriate; deference to the state court factual findings is.

Jeffries v. Wood, 114 F.3d 1484, 1498 (9th Cir. 1997), *cert. denied*, 118 S.Ct. 586 ( Dec 01, 1997) (NO. 97-289).

Before granting relief, the district court must first determine whether the state court decision was erroneous.  Van Tran v. Lindsey, 212 F.3d 1143, 1155 (9th Cir. 2000), *cert. denied*, 121 5. Ct. 340 (2000). The district court must then determine whether the state court decision involved an unreasonable application of clearly established federal law.  Id.  The district court may grant habeas relief only if it finds the state court decision was unreasonable.  Van Tran, 212 F.3d at 1153; Weighall v. Middle, 215 F.3d 1058, 1063 (9th Cir. 2000).

## A. EXHAUSTION AND PROCEDURAL BAR

As a threshold issue the Court must determine whether or not petitioner has properly presented his federal habeas claims to the state courts.  The Supreme Court has recognized that when a petitioner has defaulted on his claims in state court, principles of federalism, comity, and the orderly administration of criminal justice require that federal courts forego the exercise of their habeas corpus power.  Francis v. Henderson, 425 U.S. 536, 538-39 (1976).  In order to satisfy the exhaustion requirement, petitioner's claims must have been fairly presented **to the state's highest court**.  Picard v. Connor, 404 U.S. 270, 276 (1971); Middleton v. Cupp, 768 F.2d 1083, 1086 (9th Cir. 1985)(emphasis added).  A federal habeas petitioner must provide the state courts with a fair opportunity to correct alleged violations of prisoners' federal rights.  Duncan v. Henry, 115 S.Ct. 887, 888 (1995).  It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state law claim  was made.  Id, *citing* Picard v. Connor, 404 U.S. 270 (1971) and Anderson v. Harless, 459 U.S. 4 (1982).

Here, Respondent concedes Mr. Rasmussen properly exhausted claims 1, 2, 6, 7, 9, 10, 12, 13, and 15 within the meaning of 28 U.S.C. § 2254(b), but argues Mr. Rasmussen's remaining claims were not properly presented to the state courts or properly exhausted and therefore claims 3, 5, 8, 11, 16, 18, & 19 should not be entertained by this court.  Respondent claims 5, 16, 18, and 19 were not presented in any form in his state court briefing.  In response, Mr. Rasmussen "is in agreement with the Respondent" and he

requested that the court disregard and strike those claims from his petition.  Petitioner's Traverse (Doc. 37) at 2.  Accordingly, the court will not address the merits of Respondent's argument as to those four grounds for relief.

Respondent argues claims 3, 8, and 11, were not properly exhausted or raised in state court proceedings.  Respondent asserts that similar claims to claims 3 and 11 were raised to the Washington Supreme Court, but they were not specifically raised as a federal constitutional issue, and although claim 8 was raised as a federal constitutional issue in the Washington Supreme Court, it was not clearly raised in his appeal to the Washington Court of Appeals, where it was merely called or referred to as a "Due Process violation."  In response, Mr. Rasmussen argues claims 3, 8, and 11 were properly exhausted and presented to the state court.

Claim 3 raises the issue of whether or not the trial court erred in denying Petitioner's motion to suppress evidence found during a search of his home based on a warrant that was obtained by the lead investigator who failed to record the telephonic application for the search warrant.  Petitioner argues this claim was raised by his attorneys in conjunction with claims 1 and 2.  After reviewing the briefing the court believes that claim 3 is in fact necessarily related to claims 1 and 2, and as such, rather than determining whether or not it was properly exhausted, the issue is best examined under Stone v. Powell, discussed below.

Claim 8 states the trial court erred when it denied a motion during the penalty stage of the case for a three-week stay to allow defense counsel the opportunity to investigate newly discovered exculpatory evidence.  Petitioner raised this issue in his Personal Restraint Petition filed with the State Court of Appeals on or about July 9, 2004, and argued it was a violation of his due process rights.  Exhibit 50 at 41-44.  In response to that argument, the state prosecutor argued it was not improper for the trial court judge to deny the motion, given the fact that the proceedings at that time were limited to the issue of whether or not the jury would impose a death penalty or only life without the possibility of parole.  The state argued Mr. Rasmussen could not show any prejudice by denial of the stay or how the outcome of the penalty phase could have been more favorable to him if the stay had been granted.

Addressing Petitioner's claim that the trial court erred in denying the motion to stay the penalty proceedings to allow his counsel the opportunity to further investigate certain evidence, the State Court of Appeals wrote the following:

1

MOTION TO CONTINUE SENTENCING PROCEEDINGS

2

        During the penalty phase of the proceedings, the victim's mother's boyfriend was
arrested for assaulting the victim's mother. *See* 100 RP at 9740~ 9748. After his arrest, he

3

disclosed that the victim's mother had admitted that on the day the victim disappeared she
pushed the victim into a wall; struck her in the face with a wooden paddle; pushed some

4

clothing into her throat because she would not stop crying; and, later, found her
unconscious. *See* 100 RP at 9740-4 1, 9752, 9759-60; *see also* PRP Ex. 8. He also asserted

5

that (1) a few days after the victim disappeared the victim's mother had asked a neighbor to
hide the wooden paddle she used to "discipline" her children, [footnote omitted] asserting

6

that she was afraid she would lose her children if CPS discovered the paddle; and (2) he had
witnessed the victim's mother encouraging the victim's sister to say that she had seen

7

petitioner with the victim on the afternoon she disappeared. *See* 100 RP at 9744, 9756-57;
PRP Ex. 8. Soon after giving this statement, he failed a polygraph test and retracted his

8

statement. *See* 100 RP at 9741, 975 1-53; *see also* PRP Ex. 11.

9

        When the defense learned of this statement, it moved for a three-week continuance
to allow further investigation. 100 RP at 9741. Counsel did not move for a new trial or to

10

set aside the verdict at that time, but he suggested that he might make such a motion
following further investigation. 100 RP at 9761. The trial court refused to grant the

11

continuance. See 100 RP at 9771.

12

        Petitioner now contends that the trial court erred when it denied his motion, arguing
that (1) he would not have been convicted had the jury heard the boyfriend's

13

statement;[footnote omitted] and (2) the court's ruling prevented his counsel from fully
investigating the allegations in the statement.[footnote omitted] PRP at 41-44; Reply at

14

13-14. But petitioner fails to state how the denial of the motion affected the penalty phase
of the trial given that the jury did not impose the death penalty. Additionally, the trial court's

15

denial of the motion did not prevent the defense from investigating the matter or bringing a
CrR 7.8 motion for a new trial based on newly discovered evidence. Accordingly, petitioner

16

fails to show error or prejudice, and this argument fails.

17

Exhibit 53 at 10-12.

18

        Following the State Court of Appeals' ruling, Mr. Rasmussen filed a petition for review with the

19

Washington State Supreme Court.  Mr. Rasmussen raised the issue of the trial court's denial of his motion

20

to stay, citing to two federal cases (Grisby v. Blodgett, 130 F.3d 365 (9th Cir. 1997), and Dowthitt v.

21

Johnson, 230 F.3d 733 (5th Cir. 2000) to support the statement that the trial court had the authority to

22

continue the trial at any time in the administration of justice.  He argued, "the prejudice to Mr. Rasmussen

23

arises from this clear and certain due process violation, depriving Mr. Rasmussen of the time he needed to

24

adequately investigate newly discovered exculpatory evidence." Exhibit 54 at 9.  The Washington State

25

Supreme Court denied the petition for review without any specific ruling on the issue.  Exhibit 55.

26

        In sum, the undersigned finds Claim 8 was not  properly exhausted.  As suggested by Respondent,

27

Petitioner made vague references to his due process rights.  Petitioner clearly asserts his federal

28

constitutional right to present exculpatory evidence, but he failed to cite any support for the argument that

a federal constitutional violation occurred when the trial court denied a stay of proceedings during the penalty phase of the trial.  The two federal cases cited by Petitioner do not support Petitioner's contention. Accordingly, the court finds that the issue of whether or not he had a right to stay the penalty phase of the trial to explore newly discovered evidence was not specifically raised or argued as a federal constitutional right.  In addition, the issue of new exculpatory evidence was not properly presented in a motion to stay the case during the penalty phase of the trial.   Moreover, as noted by the State Court of Appeals, the trial court's denial of his motion to stay the penalty phase did not prejudice his ability to go forth with an investigation of the evidence nor his ability file an appropriate challenge, if warranted.

Turning to Petitioner's claim that the trial court improperly admitted evidence of photos of the victim's decomposed body (Claim 11), the court also finds that Mr. Rasmussen did not properly exhaust this claim.

Petition raised this claim in his Personal Restraint Petition filed with the State Court of Appeals on or about July 9, 2004.  Exhibit 50 at 35-37.  Citing two federal criminal cases out of the 8th Circuit, Mr. Rasmussen argued that the introduction and admission of photos of the victim's decomposed body were inflammatory and prejudicial to his defense.  The state prosecutor argued the following in response to the issue:

> The decision of whether to admit photographs lies within the sound discretion of the trial court. State v. Lord, 117 Wn.2d 829, 870, 822 P.2d 177 (1991). Gruesome photographs are admissible if the trial court finds their probative value outweighs their prejudicial effect. Id. at 871; State v. Finch, 137 Wn.2d 792, 812, 975 P.2d 967 (1999). Autopsy photographs have probative value where they are used to illustrate or explain the testimony of the pathologist who performed the autopsy. Id.
>
> Here, prior to the testimony of the medical examiner, the State identified the photographs that it intended to use during the direct of the medical examiner in addition to those that had been used in the direct of the expert on pediatric sexual assault, Dr. Duralde. RP 7591-7596. Defendant objected to only two photographs, exhibits 264 and 265. RP 7591. The prosecutor indicated that Ex. 264 depicted the lower portion of the victim's face and showed the fractured jaw and the location of the panties in the mouth and how far back in the throat the panties were placed. RP 7592. The prosecutor indicated that Ex. 265 was a picture of the upper torso of the victim which the medical examiner would use to illustrate what was relevant with regards to establishing a time of death. PP 7592-93. After examining all of the photographs the State intended to use, the court allowed the State to use the two challenged photographs noting that the panties were not visible in any other photographs and that the State had restricted itself to a "limited number of pictures." RP 7595-7596. The court reminded the attorneys that these photographs were likely upsetting to the jury. RP 7596. This record does not reflect an abuse of discretion. Petitioner cannot meet his burden of showing that error occurred below or that admission of these photographs constituted a fundamental defect resulting in a complete miscarriage of justice. This claim must be dismissed.

Exhibit 51 at 19-20.  Petitioner's reply to this argument was focused completely on the evidentiary rule ER

403 and state law.  Exhibit 52 at 11-13.   The State Court of Appeals examined the issue as a state evidentiary issue and found the trail court did not abuse its discretion in admitting the photographs, which were "highly relevant to the State's case."  Exhibit 53 at 4-6.

After reviewing the two federal cases cited by Petitioner in support of his argument (U.S. v. Petary, 857 F.2d 458 (8th Cir. 1988) and U.S. v. Davidson, 122 F.3d 531 (9th Cir. 19), the court finds no support for his argument that Claim 11 was properly raised as a federal constitutional issue and properly exhausted. The claim was argued to the state court as an evidentiary matter, not as a federal constitutional violation.

Even if Mr. Rasmussen had raised Claim 11 in the state court as a deprivation of due process under the fourteenth amendment,  which is a cognizable claim under § 2254 (Gutierrez v. Griggs, 695 F.2d 1195, 1198 (9th Cir.1983)), his claim would fail.  The factual findings of a state court challenged in a habeas proceeding are presumed correct under 28 U.S.C. §2254(e)(1). Sumner v. Mata, 449 U.S. 539, 547(1981); Austad v. Risley, 761 F.2d 1348, 1350 (9th Cir.) (en banc), cert. denied 106 S.Ct. 163 (1985). The burden is on the petitioner to establish certain defects to overcome this presumption. Id.  Here, the state courts found the photos relevant to the state's case.  Petitioner has not presented sufficient facts or argument to overcome the state court findings.

In conclusion, Petitioner properly exhausted claims 1, 2, 6, 7, 9, 10, 12, 13, and 15 within the meaning of 28 U.S.C. § 2254(b), but he has failed to properly exhaust claims 5, 8, 11, 16, 18, & 19, and unless otherwise mentioned above the court will not address the merits of those claims, as they are procedurally barred from further consideration.  The discussion below will address the merits of claims  1, 2, 3, 6, 7, 9, 10, 12, 13, and 15.

**B. CLAIMS ONE, TWO, AND THREE: FORTH AMENDMENT SEARCH AND SEIZURE**

"The Fourth Amendment assures the `right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures.'" Stone v. Powell, 428 U.S. 465, 482 (1976) (quoting the U.S. Constitution).  In order to give effect to the Fourth Amendment's protection against unreasonable searches and seizures, court's suppress or exclude from trial any evidence unlawfully obtained. See Stone v. Powell, supra, at 482-489.  Significantly, the Supreme Court, in Powell, stated:

> We hold, therefore, that where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial. [footnote omitted].

1  Stone v. Powell, 428 U.S. at 482, (emphasis added).

2        Petitioner's claims 1, 2, & 3 challenge the validity of a search warrant and the evidence seized

3  during the search of Mr. Rasmussen's home on July 7, 1996.  Petitioner argues he was not entitled to an

4  opportunity for a fair hearing on the issue of the search and seizure issue, but a review of the record does

5  not support Petitioner's argument.

6        Prior to trial, the court heard Rasmussen's motion to suppress evidence found in his trailer and

7  seized pursuant to a search warrant.  Exhibit 12; Exhibit 13; Exhibit 14; Exhibit 15.  The trial court judge

8  orally ruled that the state had established probable cause for the search warrant. Exhibit 13 at Appendix 4;

9  Exhibit 15 at 2.  The ruling was subsequently appealed to the State Court of Appeals. Exhibit 12. The

10  Court of Appeals upheld the trial court's ruling, finding that the state did not commit obvious error when it

11  determined that the judge provided sufficient independent evidence to corroborate reconstruction of the

12  complaint for warrant. Exhibit 15 at 4.  The record clearly demonstrates Mr. Rasmussen had a full and fair

13  opportunity to litigate the legality of the search.  After reviewing the claims and the state court

14  proceedings, the undersigned does not find any basis in Claims 1, 2, & 3, as a basis for granting the petition

15  for writ of habeas corpus.

16  **C.  CLAIMS 6 , 7, & 9 ; THE TRIAL COURT'S EVIDENTIARY RULINGS**

17        Defendants have a right to present a defense. Chambers v. Mississippi, 410 U.S. 284, 301 (1973);

18  Galindo v. Ylst, 971 F.2d 1427, 1429 (9th Cir. 1992), *cert. denied*, 113 S. Ct. 2351 (1993).  "The state

19  court's decision to exclude certain evidence must be so prejudicial as to jeopardize the defendant's due

20  process rights." Tinsley v. Borg, 895 F.2d 520, 530 (9th Cir. 1990), *cert. denied*, 498 U.S. 1091 (1991).

21  Ordinarily, a trial court's exclusion of defense evidence does not implicate any constitutional considerations

22  because the Constitution gives trial judges "wide latitude" to exclude evidence.  Delaware v. Van Arsdall,

23  475 U.S. 673, 679 (1986).  "We are not a state supreme court of errors: we do not review questions of

24  state evidence law. On federal habeas we may only consider whether the petitioner's conviction violated

25  constitutional norms." Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991); *see also*, Johnson v.

26  Sublett, 63 F.3d 926, 931 (9th Cir. 1995) (stating that state law foundational and admissibility questions

27  raise no federal question.).

28        What the Constitution prohibits is the exclusion of critical, trustworthy defense evidence,

particularly where the evidence directly refutes the State's allegations. *See, e.g.*, Crane v. Kentucky, 476

1   U.S. 683 (1986).  States are given considerable latitude in the administration of criminal justice and have a

2   legitimate interest in reliable and efficient trials.  Perry v. Rushen, 713 F.2d 1447, 1451 (9th Cir. 1983),

3   cert. denied, 469 U.S. 838 (1984). Before a habeas corpus court will grant relief based upon the exclusion

4   of defense evidence, the petitioner must show that his interest in presenting the defense evidence clearly

5   outweighed the State's interest in orderly trial procedures.  Id. at 1453.

6           (a) Claim Six: The Trial Court's Exclusion of Testimony from Several Witnesses

7           Petitioner claims the trial court erred when it excluded the certain testimony, including: (i) Ms.

8   Kuerst's statements that she told police officers that Mr. Rasmussen was clean-shaven on or about July 1st

9   and that he was talked about looking for a job; (ii) evidence that an investigator was shown a location

10  approximately five to seven feet from where the body was later found but did not smell any odor of a

11  decomposing body; (iii) evidence from defense expert's pathologist that blood on decomposing tissue

12  would produce a strong smell that would persist for a long time, and (iv) evidence from reverse paternity

13  testing to establish that blood found on Mr. Rasmussen's clothing was not on the clothing when it was

14  seized from his home.

15          Claim 6 was presented by Petitioner on direct appeal.  The State Court of Appeals ruled as follows:

16          None of this evidence was admissible under the rules of evidence. The out-of-court
        statement of Kuerst was hearsay under ER 801(c); it did not fall within ER 801(d)(1)(ii);
17      and it did not fall within any other exception. The out-of-court statement of Angle was
        hearsay under ER 801(c) and not within any exemption or exception. Dr. Ferris' opinion
18      was not supported by a scientific basis for saying that the odor on clothes comes from tissue
        rather than blood;[footnote omitted] he was allowed to say that the odor was unlikely to
19      have come from a bloodstain (thus giving Rasmussen much of what he wanted); and the
        admission of expert testimony is discretionary. Like the trial court, we fail to understand
20      why "reverse paternity testing" could even possibly have been relevant.

21          Rasmussen does not argue that any of this evidence was admissible under the rules.
        He does argue, however, that he had a right to admit it irrespective of the rules, due to his
22      constitutional right to compulsory process. That right exists [footnote omitted] but is not
        absolute. [Footnote omitted]  It "is subject to established rules of procedure and evidence
23      designed to assure both fairness and reliability in the ascertainment of guilt and
        innocence."[Footnote omitted]  It was subject to the rules here, and we find no error.

24  Exhibit 6 at 24-25.

25          (b) Claim Seven: The Trial Court's Exclusion of "Other Suspect Evidence"

26          A state court may exclude "other suspect" evidence if the evidence "simply affords a possible

27  ground of suspicion against such person".  People of Territory of Guam v. Ignacio, 10 F.3d 608, 615 (9th

28  Cir. 1993) (quoting Perry v. Rushen, 713 F.2d 1447, 1449 (9th Cir. 1983), cert. denied, 469 U.S. 838

(1984)). To be admissible, such evidence "must be coupled with substantial evidence tending to directly connect that person with the actual commission of the offense." Ignacio, 10 F.3d at 615; *see also* United States v. Domina, 784 F.2d 1361, 1365-67 (9th Cir. 1986), *cert. denied*, 479 U.S. 1038 (1987).

Petitioner argues the trial court, in its rulings on the state prosecutor's motions in limine, improperly excluded "other suspect" evidence, consisting of the state court granting (i) the prosecution's motions to exclude evidence from Ms. Quattlebaum (a criminal psychic) who allegedly named the victim's mother and ex-boyfriend as persons who had knowledge about the crime and/or who were directly involved in the victim's demise, (ii) an additional motion denying Petitioner access to Child Protective Service's records of the victim's mother, Rhonda Plank.

The state courts addressed Claims Seven, finding that the trial court's rulings did not err in prohibiting the evidence to be admitted at trial.  On direct appeal the State Court of Appeals addressed the issue regarding use of the Child Protective Service records, and it wrote:

> The next issue is whether Rasmussen was entitled to see records maintained by Child Protective Services (CPS) on Rhonda Plank and her children. He asked the trial court to review the records in camera and disclose any information favorable to the defense. He said he needed the information for four reasons. His first two reasons were (1) that the State intended to prove his guilt in part by showing that he had previously molested Cynthia, and (2) that the State intended to do that by introducing hearsay statements made by Cynthia before her death; thus, he said, he needed to discover any information that might impeach those hearsay statements. His third reason was that the State intended to call Ashley at trial, and that he needed information that might impeach Ashley. His fourth reason was that in the penalty phase, if any, the State intended to introduce victim impact testimony from Plank, and he needed information that might show Plank was not a caring parent. After reviewing the records and Rasmussen s reasons for wanting them, the trial court found nothing in them that was "material to the defense."[Footnote omitted]

> Rasmussen's first, second and fourth reasons are now moot. The State indicated at the time of the motion that it was "not seeking to admit any child hearsay" relating to prior incidents of molestation,[footnote omitted] and Rasmussen prevailed in the penalty phase. With respect to his allegation that the records might impeach Ashley, we have reviewed them in camera and find nothing that would have that effect, or that the trial court was required to disclose. We conclude that this issue lacks merit.

Exhibit 6 at 16.  The issue regarding the letter and/or statements of Ms. Quattlebaum was addressed by the State Court of Appeals following Petitioner's July 2004 Personal Restraint Petition.  It also found no abuse by the trial court due to the significant fact that Mr. Rasmussen never moved to present and "other suspect" evidence at trial.  Exhibit 53 at 10.

*(c) Claim Nine: The Trial Court Allowed Testimony Suggestive of Prior Criminal Misconduct*

Petitioner argues the trial court erred when it allowed testimony suggestive of his prior criminal

misconduct. In one instance, a detective testified , "[Rasmussen] had an experience before where it took

five years, and he wanted to know if it was going to take five years to get his clothes back." Exhibit 32 at

6303-04. In another instance, a police officer testified, "We had a picture of the defendant. We kept a small

photograph of a booking photo in Deputy Shaffer's log book." Exhibit 31 at 6090-91. Petitioner  argues

that the statements violated his right to due process.

The issue was reviewed by the State Court of Appeals on direct review.  With footnotes omitted, it

wrote the following:

> The next issue is whether the trial court erred by denying a motion for mistrial based
> on trial testimony given by Deputy Cassio on Tuesday, November 10, 1998, and by
> Detective Berg on Thursday, November 12, 1998. The prosecutor questioned Cassio as
> follows:
>
> Q.      Just to back up a minute, prior to your going to Rainbow Valley on
> July 6th to locate the defendant, had you seen the defendant or seen pictures
> of him?
>
> A.      We had a picture of the defendant. We kept a small photograph of a
> booking photo in Deputy Shaffer's log book, and I have a copy of that here.
>
> Q.      I'm showing you what's been admitted as Plaintiffs Exhibit I. Do you
> recognize this?
>
> A.      That's an enlarged copy.
>
> Q.      Is that a photo of the defendant?
>
> A.      Yes.
>
> Q.      And this was the information you had about the defendant's
> appearance at that time?
>
> A.      That was.
>
> The prosecutor questioned Berg as follows:
>
> Q.      I'd like to refer you now to the day after you obtained the clothing,
> and I'm on July 23rd now. On that day, did you receive a phone call from a
> male identifying himself as Guy Rasmussen?
>
> A.      Yes, I did.
>
> Q.      Where did you receive this phone call at?
>
> A.      I was at my office. Actually, I think this one was just at the precinct.
> It came through the front desk area and it was passed to me.
>
> Q.      The caller on the other end identified himself as Guy Rasmussen?
>
> A.      Yes, he did.

REPORT AND RECOMMENDATION
Page - 15

1    Q.    What was the reason for his call?

2    A.    He was inquiring about the clothes I had taken in the search
warrants.

3

4    Q.    Do you recall what specifically he said with regard to the clothing?

5    A.    He wanted to know when he could get them back and how long it
was going to take. He asked me why I had taken certain items, such as
license plates, and I explained to him our purpose and what we took.

6

7    Q.    Did you indicate that you -were you able to provide him with a time
frame as to when he might get his clothing back?

8    A.    No. He complained that, you know, he had an experience before
where it took five years, and he wanted to know if it was going to take five
years to get his clothes back.

9

10        [Defense Counsel]: Objection, Your Honor. Unresponsive.

11        The Court: That is sustained.

12   Rasmussen's only objection was the one just shown. He did not move for a mistrial
until Monday, November 16, 1998, when he argued that the "testimony was in violation of
an order in limine barring the State from introducing evidence of prior convictions or
uncharged misconduct." He declared then, for the first time, that he had been "severely
prejudiced and that the court should declare a mistrial." The trial court ruled:

13

14

15        [W]ith regard to Deputy Cassio, there was one mention of a booking photo.
I don't find that that has got any significant impact on this case, because we
already have a photo montage, and I don't think we've got ignorant jurors
here, and they are going to assume this photo of Mr. Rasmussen and the
other people came from someplace, and I don't think that causes any serious
prejudice to the defendant.

16

17

18

19        And with regard to. .. Detective Berg's matter, that was stricken from the
record, didn't go into any specific details. It just said previous experience
with regard to clothes, not detail. I don't see there's any real prejudice to the
defense here in light of how these matters were handled and kept very short.
For those reasons, the motion for mistrial is denied.

20

21

22   When deciding a motion for mistrial, a trial court must determine "whether the
remark when viewed against the backdrop of all the evidence so tainted the entire
proceeding that the accused did not have a fair trial." We review its determination only for
abuse of discretion.

23

24   Cassio's and Berg's comments were both minor. The content of Cassio's comment
was not entirely new to the jury, which had already heard evidence that the police had
included a photo of Rasmussen in the montage shown to Hull. Rasmussen did not object to
Cassio's testimony. His objection to Berg's testimony was sustained, and he did not seek
further relief at that time. His motion for mistrial was untimely, for it came six days after
Cassio's testimony and four days after Berg's. For each and all these reasons, the trial court
did not abuse its discretion.

25

26

27

28   Exhibit 6 at 19-22.

After carefully considering the record, in light of the legal standards noted above, the undersigned finds no merit to Petitioner's challenges to the trial court's evidentiary rulings. Significantly, the state court's factual findings are presumed correct, and Mr. Rasmussen has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. §2254(e)(1). Petitioner has not shown the court that the rulings were so prejudicial as to jeopardize his due process rights. Moreover, the state court's rulings were clearly evidentiary matters, involving in many cases foundational and admissibility questions, which do not raise a federal question. Petitioner has not persuaded the court that the evidence he wished to have either admitted or excluded at trial outweighed the State's interest in an orderly trial procedures. Accordingly, the court finds the Washington Court of Appeals' decisions upholding the conviction are not contrary to or an unreasonable application of federal law, as determined by the United States Supreme Court.

### D. CLAIM 10: PETITIONER'S RIGHT TO REMAIN SILENT

Petitioner argues a number of witnesses were permitted to testify that Mr. Rasmussen was notified several times at the Rainbow Valley Music Festival that the police wished to speak to him about the victim's disappearance and that he was urged to, but did not, contact the police before he was escorted out of the festival by the event's promoter. Petitioner argues this testimony violated his right to remain silent, protected by the Fifth Amendment.

Contrary to the citations in Petitioner's briefing and contrary to decisions of the First, Seventh, and Tenth Circuits, the Ninth Circuit has ruled that a prosecutor may comment on a defendant's pre-arrest silence since Miranda rights are not implicated until the defendant is in custody. U.S. v. Oplinger, 150 F.3d 1061, 1066-67 (9th Cir. 1998). Accordingly, Petitioner's claim that testimony regarding his refusal to speak to police officers about the victim's disappearance does not provide a legitimate basis to seek a writ of habeas corpus.

### E. CLAIM 12: INEFFECTIVE ASSISTANCE OF COUNSEL

Ineffective assistance of counsel claims require a showing that (1) counsel's performance was constitutionally deficient, and (2) but for this deficiency, there is a reasonable probability that the outcome would have been different. Strickland v. Washington, 466 U.S. 668, 687 (1984). Considering the first prong, petitioner must rebut "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and that counsel's performance was "sound trial strategy." Id. at 689.

The Court must attempt to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. To meet the second Strickland requirement of prejudice, "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

Petitioner claims his trial counsel's failure to seek to suppress evidence from a crime scene that has been severely compromised by the detective who discovered the victim's remains deprived him of his right to effective assistance of counsel as provided by the Sixth Amendment. Petition (Doc. 10) at "Attachment C." This issue was raised and exhausted following the filing of Mr. Rasmussen's Personal Restraint Petition in July 2004, and the State Court rejected the argument. The court ruled as follows:

> As discussed above, the jury heard testimony indicating that the victim's body was in an advanced state of decomposition when discovered, that Floberg moved the victim's body and other materials at the site before photographs were taken or evidence was gathered, and that moving the body could have potentially altered its condition. These facts went to the weight of this evidence and it is unlikely any objection on this basis would have been successful. Accordingly, petitioner fails to establish ineffective assistance of counsel on this basis.

Exhibit 53 at 14-15.

Respondent's Amended Answer accurately and fairly summarizes the testimony in question, stating:

> At trial, Detective Floberg with the Pierce County Sheriff's Department testified that he received a letter from a psychic, Shirley Quattlebaum, 12 days after the victim had been reported missing. Exhibit 29 at 5803. She wrote that she had had a vision and learned where Cynthia Allinger's body was located and provided this information to the detective. Id. Detective Floberg went the area described in the letter, the northeast side of Interstate 5 in the north McChord gate area, to check out this "lead." Id. It was about 9:00 pm at night and starting to get dark, so he left off his search and returned the next day. Exhibit 29 at 5805.
>
> The next day, while walking along a fence line that separated the freeway from an abandoned house, he smelled the odor of decomposition. Id. at 5807. Trying to trace the odor to its source led him to an overgrown area where a pile of carpets and an old water tank had been dumped. Id. at 5807-5808. Uncertain whether the odor was coming from human or animal remains, Detective Floberg moved the carpet pieces until he pulled on one that seemed heavier than the others; he lifted a flap of carpet on this piece and saw a child's legs. Id. at 5809, 5845-5846. Detective Floberg estimates that he moved this carpet piece several feet in this discovery process. Exhibit 29 at 5809. Detective Floberg then called for forensic technicians and other officers. Id. at 5811.

Amended Answer (Doc. 35) at 29-30.

Review of the trial court record shows that Petitioner's counsel effectively cross-examined

1    Detective Floberg regarding his actions.  Exhibit 29 at 5832-5838.  As argued by Respondent, "The

2    cross-examination shows a tactical decision to use the evidence that the detective had moved pieces of

3    carpet as a method of impeaching the witness by highlighting actions that, arguably, showed poor

4    judgment. This cross- examination could also cause the jury to give less weight to the evidence collected at

5    the crime scene if it felt that the detective's actions destroyed the evidence's usefulness or reliability.

6    Defense counsel reiterated this theme in closing argument. Exhibit 48 at 9585-9586, 9626-9627. It is clear

7    that defense counsel made a tactical decision to use evidence that the body had been moved to his

8    advantage rather than trying to exclude it."    After reviewing the arguments and the record, the

9    undersigned finds Petitioner has failed to show how his counsel's performance was constitutionally

10   deficient and/or prejudicial to the outcome of his case.

11   *F.  CLAIM 13: USE OF SHACKLES DURING TRIAL*

12        A criminal defendant has the right to be free of shackles and handcuffs in the presence of the jury,

13   unless shackling is justified by an essential state interest.  Rhoden v. Rowland, 172 F.3d 633, 636(9th

14   Cir.1999).  In order for a defendant to prevail on a claim of this nature, a court must find that the

15   defendant was indeed physically restrained in the presence of the jury, that the shackling was seen by the

16   jury, and that the physical restraint was not justified by state interests.   If a constitutional error is found,

17   the federal court next must ask whether the error had a "substantial and injurious effect" on the jury's

18   verdict.  Castillo v. Stainer, 997 F.2d 669, 669 (9th Cir.1993).

19        Here, Petition argues that the trial court required him to be shackled during trial in violation of

20   constitutional due process.  The State Court of Appeals found no violation, when it reviewed this claim in

21   October 2005.  The State Court ruled:

22        Petitioner was required to wear ankle restraints during his trial. *See* 36 RP at 1939.
          To obscure the jury's view of the restraints, the court placed several boxes in front defense
23        counsel's table. PRP Ex. 27 at 1.
               Requesting an evidentiary hearing on the matter, now petitioner contends that (1)
24        the trial court erred by failing to hold a hearing to determine whether restraints were
          necessary, and (2) the jury was able to observe the shackles when he stood. PRP at 44- 45.
25        To support his argument, he provides an affidavit from one of his trial counsel stating that
          "it is unclear how successful" the attempt to conceal the shackles was and that petitioner
26        "did not believe that [piling the boxes in front of the table to block the jury's view of his
          ankles] effectively concealed his shackling at all times." PRP Ex. 27 at 1.
27             To obtain relief, petitioner must show he was actually and substantially prejudiced
          by a violation of his constitutional rights or by a fundamental error of law. *Lord,* 123 Wn.
28        2d at 303; *Cook,* 114 Wn.2d at 810. Petitioner is entitled to an evidentiary hearing if he
          makes a prima facie showing of error but the issue cannot be fully resolved on the existing

1
2
3
4
5

> record. RAP 1 6.11(b). This court will order an evidentiary hearing only if petitioner
> demonstrates that he has competent, admissible evidence establishing facts which would
> require relief. *Rice*, 118 Wn.2d at 886. To establish the necessary prejudice here, petitioner
> would have to show that the jury actually saw the restraints. *See State v. Hutchinson*, 135
> Wn.2d 863, 888 (1998), cert. denied, 525 U.S. 1157 (1999).
>     At best, petitioner alleges that the jurors may have seen the restraints, and his
> attorney's declaration merely reiterates this allegation. Because petitioner fails to support his
> assertion that the jury saw the restraints with anything beyond his conclusory,[footnote
> omitted] speculative statements, he is not entitled to an evidentiary hearing or relief on this
> basis.

6
7

Exhibit 53 at 12-13.

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

A review of the record shows that Mr. Rasmussen wore leg restraints during the trial, but it does not support finding a violation or the need for an evidentiary hearing. The issue was discussed on the record with counsel during a pretrial hearing, and Mr. Rasmussen was given a choice of either wearing a stun-belt, which the court explained would alleviate any further discussion of how to orchestrate jury selection and Petitioner's location in the courtroom, or leg restraints. Mr. Rasmussen chose not to wear the belt, and in order to eliminate or significantly reduce the chance of having jurors see the leg restraints the court asked the parties to be in the courtroom early on the day of jury selection to ensure they were not going to have any problems in this regard. See pages 4187-4190 of the Trial Court transcript, which was submitted by Petitioner on July 15, along with his Petition and Supporting Memoranda. The court notes that record indicates Mr. Rasmussen was positioned at a table furthest away from the jury panel during selection. As noted by the State Court of Appeals and by Petitioner, to remove the possibility that the jurors could see his leg restraints, boxes were used to block jurors' view of Petitioner's feet during the trial. This would have prevented all but brief glimpses of Petitioner's leg restraints by jurors. A jury's brief or inadvertent glimpse of a defendant in physical restraints outside of the courtroom has not warranted habeas relief. *See* United States v. Olano, 62 F.3d 1180, 1190 (9th Cir.1995); United States v. Halliburton, 870 F.2d 557, 560-61 (9th Cir.1989); Wilson v. McCarthy, 770 F.2d 1482, 1485-86 (9th Cir.1985). The defendants in those cases did not demonstrate that they suffered actual prejudice. *See* Olano, 62 F.3d at 1190; Halliburton, 870 F.2d at 561.

26

**G. CLAIM 15: PROSECUTORIAL MISCONDUCT**

27
28

Federal habeas review of prosecutorial misconduct is limited to the narrow issue of whether the conduct violated due process. *See* Thomas v. Borg, 74 F.3d 1571, 1576 (9th Cir.), *cert. denied*, 117 S.Ct. 227 (1996). Prosecutorial misconduct violates due process when it has a substantial and injurious effect or

REPORT AND RECOMMENDATION
Page - 20

1   influence in determining the jury's verdict.  *See* <u>Ortiz- Sandoval v. Gomez</u>, 81 F.3d 891, 899 (9th

2   Cir.1996).  It is permissible for a prosecutor to argue inferences based on evidence introduced at trial.  *See*

3   <u>Duckett v. Godinez</u>, 67 F.3d 734, 742 (9th Cir.1995), *cert. denied*, 116 S.Ct. 1549 (1996).  Moreover,

4   where the trial court gives the jury a curative instruction, it is presumed that the jury will follow that

5   instruction.  *See* <u>Greer v. Miller</u>, 483 U.S. 756, 766 n. 8 (1987);  *see also* <u>Burks v. Borg</u>, 27 F.3d 1424,

6   1431 (9th Cir.1994).

7       Petitioner argues the prosecutor, during closing argument, "misrepresented numerous facts not in

8   evidence, vouched for state witnesses; made inappropriate comments on Mr. Rasmussen's state of mind,

9   pre-arrest silence, truthfulness, and trial appearance" and "denigrated the defense as a sham, disparaged

10  defense counsel, suggested the defense was trying to trick the jury, shifted the burden of proof, displayed

11  the gruesome photos of the child's decomposed remains, and actually suggested to the jury to rule on their

12  sympathy and emotions."  Petition (Doc. 10) at "Attachment D".   The State Court of Appeals reviewed

13  this claim, and summarily dismissed it, stating, "Overlooking these characteristics and examining the

14  remarks themselves, we hold that each remark was within the bounds of advocacy or too minor to warrant

15  reversal." [Footnote omitted].  Exhibit 6 at 26.

16      This court finds no error or misconduct sufficient to grant the petition for writ of habeas corpus.

17  The court has carefully reviewed the record and finds no remark or argument so inflammatory as to infect

18  the entire trial with unfairness and make the resultant conviction a denial of Mr. Rasmussen's right to due

19  process.  Moreover, the court notes that the state trial court instructed the jury that counsels' comments

20  were not evidence.   The State Court of Appeals reasonably determined that the prosecutor's argument did

21  not constitute misconduct.

22                      <u>**CONCLUSION**</u>

23      For the foregoing reasons, the Court should deny Mr. Wright's petition for writ of habeas corpus.

24  Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall

25  have ten (10) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6.  Failure

26  to file objections will result in a waiver of those objections for purposes of appeal.  <u>Thomas v. Arn</u>, 474

27  U.S. 140 (1985).  Accommodating the time limit imposed by Rule 72(b), the clerk is directed to set the

28  matter for consideration on **November 10, 2006**, as noted in the caption.

1    DATED this 20th day of October, 2006.

2
                              /s/ J. Kelley Arnold
3                             J. Kelley Arnold
                              United States Magistrate Judge
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28